**MARYLAND CASUALTY COMPANY, Plaintiff–Appellant–Cross–Appellee,**

**Continental Casualty Company, Defendant–Appellant–Cross–Appellee,**

v.

**W.R. GRACE AND COMPANY, Aetna Casualty & Surety Company, Defendants,**

**Royal Indemnity Co., Defendant–Appellee,**

**General Insurance Company of America, Defendant–Appellee–Cross–Appellant.**

**Nos. 98–7492, 98–7582 and 98–7584.**

United States Court of Appeals, Second Circuit.

Argued Sept. 1, 1999.

Decided July 5, 2000.

Laura A. Foggan, Washington, D.C. (John C. Yang, Timothy J. Simeone, Wiley, Rein & Fielding, Washington, D.C., of counsel), for Appellant Maryland Casualty Company.

Guy M. Struve, New York, New York (James D. Liss, Daryl E. Davis (law clerk), Davis Polk & Wardwell, New York, New York; Michael I. Anania, Paul V. Majkowski, Ford Marrin Esposito Witmeyer & Gleser, LLP, New York, New York, of counsel), for Appellant Continental Casualty Company.

Carl J. Pernicone, New York, New York (James P. Donovan, Robert L. Joyce, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, New York, of counsel), for Appellee Royal Indemnity Company.

Kurtis B. Reeg, Sonnenschein, Nath & Rosenthal, St. Louis, Missouri (Cawood K. Bebout, Gallop, Johnson & Neuman, L.C., St. Louis, Missouri, of counsel), for Appellee General Insurance Company of America.

Before: NEWMAN, CARDAMONE, and JACOBS, Circuit Judges.

CARDAMONE, Circuit Judge:

The record on this appeal reveals that asbestos-laden dust readily adheres to clothing, house furniture, and automobile upholstery, exposing not only the individual who works directly with the substance, but also others who come in contact with these familiar objects, to the pernicious health risks asbestos dust causes. The litigation before us is a reflection of the complex efforts to determine who will pay, insofar as possible, for the human losses incurred as a result of breathing in this cancer-causing dust. And while the long-lasting risk to health from asbestos may not yet have ended, the litigation it spawned against a principal producer of the product and its insurers hopefully with this opinion will have run its course.

The specific task facing us in this mass tort case concerns the proper allocation of defense costs arising from asbestos related litigation against W.R. Grace & Company (Grace). We must decide under equitable principles whether later settling insurance carriers are obligated to contribute to defense costs paid by carriers that had settled earlier with the insured.

The parties before us are four insurance companies. Two of them—Maryland Casualty Company and Continental Casualty Company—are appellants, the third—General Insurance Company of America is a cross-appellant, and the fourth—Royal Indemnity Company—took no appeal itself, but along with General Insurance Company is an appellee. The appeal and cross-appeal are from a final judgment entered on March 4, 1998 in the United States District Court for the Southern District of New York (Bernikow, Magistrate Judge) that dismissed all the claims of all the parties.

## BACKGROUND

### A. Recognition of Risk and Impact on Grace

As a backdrop to our discussion we trace very briefly how this asbestos litigation

began and its impact on Grace. Asbestos was first recognized as a cancer risk about 35 years ago. In 1964 a Grace mine worker developed pulmonary fibrosis from exposure to asbestos-laden dust. That same year the Journal of the American Medical Association published a study on death due to lung cancer and its relation to asbestos. The study tracked, up until 1962, 632 insulation workers who entered the trade before 1943 and found that 45 died of lung cancer, while only 6.6 such deaths were to be expected. After 1964 the evidence that asbestos-laden dust caused cancer mounted. By 1969 Grace had acknowledged that asbestos was a health hazard, and it instituted a program to develop a substitute for asbestos in its fireproofing products. Between 1965 and 1972 more studies were released reconfirming the 1964 report of cancer risk. The problem was of nationwide proportions, since asbestos fireproofing material was installed in all kinds of public buildings, including schools, hospitals, and airports, as well as homes throughout the country.

The impact on Grace, one of the product's principal producers, was enormous. In August 1971 the first asbestos bodily injury suit was filed against Grace. In July 1981, ten years after the filing of that first bodily injury asbestos suit against Grace, the *New York Times* reported that 251,000 workers exposed to asbestos had filed 12,000 lawsuits against 260 companies that manufactured, used or sold asbestos. This tide of lawsuits began slowly against Grace, but eventually engulfed it. By 1982 Grace was a defendant in 30 more suits; at the close of 1983 it was a defendant in 297 additional suits and by 1993—38,000.

Grace's defense costs escalated as the volume of claims against it rose, so that by early 1991 it was incurring defense costs of millions of dollars per month. From 1991 to 1995 Grace's defense costs were in excess of $200 million.

### B. *Insurance Coverage*

To help meet this rising tide of litigation, Grace turned to its insurance carri-

ers. Grace had primary insurance coverage from appellant Maryland Casualty Company (Maryland) from June 30, 1962 to June 30, 1973 and from appellant Continental Casualty Company (CNA) from 1973 through 1985. Grace produced no asbestos-related materials before 1963. In 1963 it acquired Zonolite Company, a nationwide manufacturer, distributor and licenser of asbestos materials. Appellee Royal Indemnity Company (Royal) insured Zonolite from March 31, 1953 through April 1, 1963. In 1966 Grace acquired Vermiculite Northwest, Inc., a small business employing 14 people, manufacturing products containing vermiculite—a mineral that contained asbestos—under a license from Zonolite. Vermiculite's sales were restricted to five northwestern states. General Insurance Company of America (General) insured Vermiculite Northwest, Inc. from June 1, 1961 to June 1, 1967.

### Prior Legal Proceedings

### A. *Declaratory Judgment Action*

In 1983 Maryland brought a declaratory judgment action against Grace and CNA in the Southern District of New York to obtain a judicial determination regarding its obligation to indemnify and defend Grace. The three parties referred the litigation for all purposes to U.S. Magistrate Judge Leonard Bernikow pursuant to 28 U.S.C. § 636(c). Maryland and CNA each agreed to pay 50 percent of Grace's bodily injury defense costs as they accrued, pending a ruling on their legal obligations.

In 1984 evidence of Royal's and General's policies came to light and Maryland successfully moved before the trial court to add these two carriers as defendants to the pending action. During the eight-year period from 1983 to 1991, Maryland and CNA continued to pay Grace's bodily injury defense costs as they accrued. Royal and General concede that they paid none of those costs. The failure of appellees to pay their allegedly appropriate share of

the pre–1991 defense costs as they accrued is the subject of the instant litigation. Maryland and CNA seek to recover from the two appellees contribution of an equal share of those costs.

## B. Settlements

During the course of this extensive litigation all four insurance companies settled with Grace: CNA in 1990, Maryland in 1991, General in 1994 and Royal in 1995. Under CNA's 1990 settlement with Grace, CNA paid Grace its entire indemnity limit plus all of Grace's defense costs through July 31, 1990. The settlement terminated any subsequent defense obligations of CNA. Grace agreed not to seek reimbursement from its other insurers for defense costs incurred through July 31, 1990 as CNA, which had paid them, would seek reimbursement and Grace, it was agreed, would seek recovery for defense costs from other insurers for costs incurred after July 31, 1990. In 1991 Maryland entered into a settlement with Grace similar to CNA's. Maryland also exhausted its policy limits. In addition, Maryland paid millions more to ensure that Grace was fully reimbursed for defense costs incurred through August 31, 1991.

When appellee General settled with Grace in March 1994, it acknowledged that CNA and Maryland collectively "fully paid and Grace has been fully reimbursed for all judgments, settlements, and Defense Costs incurred by Grace through August 31, 1991." Royal settled with Grace in January 1995 after appellants had made motions seeking reimbursement of defense costs they had paid earlier. Under the settlement agreement Royal paid Grace many millions of dollars in full satisfaction of its indemnity and defense obligations to Grace. Grace agreed to indemnify and hold Royal harmless from products claims from other insureds. It is the purpose of the agreement to release Royal from any and all obligations "past, present, existing or future" occurring "to Grace or the other insureds."

## C. Motions for Summary Judgment and Magistrate Judge's Decisions

Maryland and CNA thereafter sought summary judgment against Royal for reimbursement of Royal's alleged share of the pre–1991 defense costs. Royal opposed reimbursement on the grounds that its settlement with Grace barred Maryland's suit against it as a matter of law. Royal also cross-moved for summary judgment with respect to Maryland's and CNA's claims against it on the grounds that the notice provisions in Royal's policies had not been satisfied.

On March 29, 1996 the trial court granted Royal's motion for summary judgment, dismissing CNA's and Maryland's reimbursement claims against it. It agreed with Royal that its settlement with Grace barred those claims as a matter of law. The magistrate judge also ruled that Royal had fully satisfied its coverage obligations to Grace. *Maryland Cas. Co. v. W.R. Grace & Co.*, No. 83 Civ. 7451 (S.D.N.Y. Mar. 29, 1996). When appellant Maryland moved for reconsideration, the magistrate judge denied reconsideration in a written opinion. *Maryland Cas. Co. v. W.R. Grace & Co.*, No. 83 Civ. 7451, 1997 WL 26281 (S.D.N.Y. Jan. 23, 1997). On January 8, 1998, addressing the remaining inter-insurer claims, the trial court dismissed all of them, in a sealed opinion. *Maryland Cas. Co. v. W.R. Grace & Co.*, No. 83 Civ. 7451 (S.D.N.Y. Jan. 8, 1998). Final judgment was entered on March 4, 1998. It is from this judgment that Maryland and CNA appeal.

## DISCUSSION

On appeal the parties present a number of arguments that we summarize briefly before beginning our discussion. The principal argument Maryland and CNA make is that before 1991 they carried and paid all of Grace's bodily injury defense costs, while Royal and General, which also had insurance coverage over the claims

made against Grace, paid nothing. They urge therefore that they are entitled to contribution from the appellees for their equal share of those defense costs and that for the trial court to rule against them on this issue as a matter of law was error.

Appellants also urge that the magistrate judge misapprehended the law when he ruled that Royal's and General's settlements with Grace extinguished appellants' right to contribution because appellants were not a party to appellees' agreements with Grace and because the text of the agreements plainly preserved appellants' right to contribution. Further, Maryland and CNA contend that if there is some ambiguity, it should be resolved by examining extrinsic evidence of the parties' intent, a subject that the magistrate judge foreclosed by granting summary judgment. Moreover, the argument continues, if the right to reimbursement was decided as a matter of equity, as it appeared in fact to have been, a factual record on which to weigh the equities is needed instead of the trial judge's resolution of the facts in favor of appellees. For these reasons appellants urge us to reverse the grant of summary judgment in appellees' favor and remand for determination of appellants' claims.

Appellees respond that as settled insurers who have fully satisfied their coverage obligations to the insured they have no legal obligation to repay insurers who settled before them. Contribution claims against settled insurers, appellees tell us, are barred as a matter of law. Contribution rights, if any, are based on equitable, not legal principles. Royal argues that its multi-million dollar payment to Grace far exceeds the amount Maryland paid in settlement with Grace and is in excess of Royal's pro rata share of Grace's asbestos-related defense costs. Further, appellees maintain that even were they to contribute, it would not be on an equal, but rather on a pro rata, basis. Their reason for this is that the existence of the right to contribution depends on the language in the insurance policies. Here, appellants' and Royal's policies contain other insurance clauses that require the apportionment of defense costs on a pro rata basis. Further, where, as here, no further insurance coverage is available, no foundation for contribution exists in any event. Appellees urge us to affirm the final judgment.

## I  Magistrate Judge's Holding

In its opinion dismissing Maryland and CNA's claims for reimbursement against Royal and General, the district court concluded that Royal's settlement with Grace extinguished, as a matter of law, any equitable right of contribution that Maryland and CNA might have had arising from obligations pre-dating that settlement. Judge Bernikow reasoned that because Royal had fully satisfied its coverage obligations to Grace and obtained a release from further liability through its settlement with Grace, it could not be subject to reimbursement claims from Maryland and CNA. The court distinguished those cases where one insurer successfully sought reimbursement from a later settling insurer on two grounds.

First, Royal's payment to Grace, which satisfied its coverage obligations, persuaded the district court that this case differed from those instances where a non-paying insurer entirely shirked its payment obligations. The court rejected Maryland's argument that its reimbursement rights vested at the time it made payments to Grace for defense costs, and could not be extinguished by virtue of Royal's after-the-fact settlement with Grace. Cases like *Federal Ins. Co. v. Cablevision Sys. Dev. Co.*, 836 F.2d 54, 58–60 (2d Cir.1987), *Vigilant Ins. Co. v. Employers Ins. of Wausau*, 626 F.Supp. 262, 269 (S.D.N.Y.1986), and *Emons Indus., Inc. v. Liberty Mut. Fire Ins. Co.*, 481 F.Supp. 1022, 1027 (S.D.N.Y. 1979), the trial court explained, involved insurers who refused to defend or indemnify the insured, and thus establish nothing beyond the undisputed principle that a paying insurer can recover from a non-paying insurer. *See Zurich–American*

*Ins. Cos. v. Atlantic Mut. Ins. Cos.*, 139 A.D.2d 379, 531 N.Y.S.2d 911, 916 (1st Dep't 1988), *aff'd*, 74 N.Y.2d 621, 541 N.Y.S.2d 970, 539 N.E.2d 1098 (1989). Therefore, the trial court concluded that when an insurer in good faith satisfies its obligations to its insured, as Royal did through its settlement with Grace, it becomes forever immune to reimbursement claims from other insurers as a matter of law, regardless of the amount it paid, or the conditions under which it was released from further liability.

Second, the court distinguished successful reimbursement suits against later settling insurers on the ground that they involved subrogation rights, rather than the equitable contribution sought here by Maryland and CNA. It found the principle of subrogation inapplicable to this case because Maryland is not seeking recovery from a third party wrongdoer but from another insurer. The outcomes in two principal New York state cases on subrogation, *Ocean Accident & Guarantee Corp. v. Hooker Electrochemical Co.*, 240 N.Y. 37, 47–49, 147 N.E. 351 (1925), and *Hamilton Fire Ins. Co. v. Greger*, 246 N.Y. 162, 164, 167–68, 158 N.E. 60 (1927), the trial court explained, resulted not from the pre-settlement vesting of a reimbursement right, but from particular facts that authorized subrogation. Specifically, an "insurer who pays claims against the insured for damages caused by the default or wrongdoing of a third party is entitled to be subrogated to the rights which the insured would have had against such a third party for its default or wrongdoing." *Ocean Accident*, 240 N.Y. at 47, 147 N.E. 351. Thus, the trial court ruled that the only circumstance when a settlement with the insured fails to extinguish an antecedent reimbursement right is when the settling party happens to be a "third-party wrongdoer." Relying on *Wendy's Int'l, Inc. v. Karsko*, 94 F.3d 1010 (6th Cir.1996), the magistrate judge similarly found that Maryland and CNA's claims against General were barred, as a matter of law, because the "subrogation rule" could only be en-

forced against a tortfeasor, not an insurer. *See id.* at 1011 (finding that the subrogation doctrine "applies only against tortfeasors" and permitting subrogation in this instance "would violate fundamental principles of restitution or unjust enrichment law on which the doctrine of subrogation rests").

▇ While the argument, urged by Maryland and CNA, that an insurer's reimbursement right arising prior to its coinsurer's settlement is fixed and completely unalterable by subsequent events is clearly too broad, the district court's opposite conclusion was similarly oversimplified. The notion that any settlement by which an insurer obtains a release from its insured, regardless of its terms, insulates that insurer from all contribution claims, is untenable. Of course, under New York law where an insurer, under a duty to defend, wrongfully refuses to do so, it is liable for its share of a reasonable settlement of the suit. It is also a well-settled principle in the law of contribution that when one party jointly liable on an obligation pays more than its pro rata share, it may compel the co-obligors to contribute their share of the amount paid. *See* Henry L. McClintock, *Handbook of the Principles of Equity*, 542 (2d ed.1948). Hence, the relevant inquiry is whether the settlement of the suit was reasonable or equitable, not simply whether there was a settlement.

## II  Equitable Principles Governing Instant Litigation

### A.  *In General*

▇ We think decisional law supports the notion that the resolution of this case hinges on equitable principles. Those basic principles are widely accepted. Contribution rights, if any, between two or more insurance companies insuring the same event are not based on the law of contracts. This follows from basic common sense because the contracts entered into are formed between the insurer and the insured, not between two insurance compa-

nies. Accordingly, whatever rights the insurers have against one another do not arise from contractual undertakings. By the same token, the contract of settlement an insurer enters into with the insured cannot affect the rights of another insurer who is not a party to it. Instead, whatever obligations or rights to contribution may exist between two or more insurers of the same event flow from equitable principles. *See United States Fire Ins. Co. v. Federal Ins. Co.*, 858 F.2d 882, 888 (2d Cir.1988); *Aetna Cas. & Surety Co. v. Merchants Mut. Ins. Co.*, 78 A.D.2d 176, 435 N.Y.S.2d 125 (3d Dep't 1980), *abrogated on other grounds by Motor Vehicle Accident Indemnification Corp. v. Aetna Cas. & Surety Co.*, 89 N.Y.2d 214, 220, 652 N.Y.S.2d 584, 674 N.E.2d 1349 (1996).

Appellants argue forcefully that principles underlying the doctrine of subrogation should apply to their claim. They urge that the reasoning of the leading New York cases in this area refutes the trial court's conclusion that appellees' settlements with Grace precluded appellants' reimbursement claims and, appellants continue, based on subrogation they retain vested rights to these claims. Although subrogation, like contribution, is based on equitable principles, subrogation is not applicable in this case.

■ It is true that the decisions in *Ocean Accident*, 240 N.Y. 37, 147 N.E. 351, and *Hamilton Fire*, 246 N.Y. 162, 158 N.E. 60, suggest that equitable grounds control whether recovery is ultimately available when subrogation applies. *See Hamilton Fire*, 246 N.Y. at 167–68, 158 N.E. 60 (recovery only available if tortfeasor paid less than the full amount caused by its negligence, and no right of subrogation if no showing that insured received from tortfeasor moneys equitably belonging to insurer); *Ocean Accident*, 240 N.Y. at 47–49, 147 N.E. 351 ("right of subrogation is based upon principles of equity and natural justice"). But it is also clear under New York law that consideration of the equities of a claim for subrogation is predicated upon the insurer having satisfied its obligation to an insured who is damaged by a third-party wrongdoer. *See Winkelmann v. Excelsior Ins. Co.*, 85 N.Y.2d 577, 581, 626 N.Y.S.2d 994, 650 N.E.2d 841 (1995) ("Subrogation is the principle by which an insurer, having paid losses of its insured, is placed in the position of the insured so that it may recover from the third party legally responsible for the loss.... The doctrine is liberally applied for the protection of those who are its natural beneficiaries—insurers that have been compelled by contract to pay the loss caused by the negligence of another.") (citing *Ocean Accident*, 240 N.Y. at 47, 147 N.E. 351).

We agree with the magistrate judge that this case does not involve subrogation because the appellants are not seeking reimbursement from a third-party wrongdoer. But, we cannot agree with the magistrate judge's bright-line rule that later settlements extinguish the right to reimbursement as a matter of law. In holding that considerations of equity control the right to reimbursement, we do so in this case based upon equitable principles underlying the law of contribution.

### B. *Resolution of the Equities*

■ We now pass to equitable considerations in the case at hand. Where more than one insurer has issued policies covering the same risk, a court of equity will exercise jurisdiction over the entire controversy to resolve the rights of all the interested parties, particularly where the issues between the insurers and the insured are similar. *See* 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 261s (5th ed.1941).

■ Maryland and CNA essentially argue that we should adopt a rule that earlier settling carriers, like themselves, thereby acquire vested independent rights to be repaid by later settling insurers like Royal and General. Even if an earlier settler acquires an equitable right of contribution,

that right cannot be predicated on the fact that Maryland and CNA settled with Grace first. Instead, equitable contribution is a right that can be affected by events that post-date the payments if they bear upon fairness and equity. Hence, if a later settling insurer procures a release from the policyholder in exchange for a fractional payment that is a windfall for the insurer, that event would be scrutinized by equity in the context of policy terms, coverage issues and defenses (as well as other contributing payments), and may be found wanting. Instead, whatever contribution rights exist do so because an insurer that insures a common risk with other carriers can demonstrate that it paid more than its fair share of the relevant costs. It is at this juncture that Maryland's and CNA's equitable contribution claims founder.

As already noted, Royal's settlement with Grace vastly exceeded the indemnity limits of the policies it issued to Grace, vastly exceeded its pro rata share of Grace's losses, and also exceeded the entire payment Maryland made to Grace. It is appropriate to consider that both Royal and General, the later settling insurers, paid out their limits, and paid defense costs worth multiple times those limits, notwithstanding the existence of coverage defenses, including the potent defense of late notice.

General, as noted earlier, made a full and complete settlement with Grace, paying its indemnity limits plus an additional amount for defense costs. Of the named insurance carriers involved in this appeal, General is by far the smallest and had the least risk exposure to the asbestos claims because its insured, Vermiculite Northwest, Inc., was such a small operator. As a reflection of that fact, the dollar amount of General's settlement was considerably less than the other insurers'.

With respect to how costs are apportioned among successive insurers on the same risk, as Maryland, CNA and Royal are here, we note that the law of New York follows those provisions of the policies that may permit contribution by equal shares. *See New York v. Blank*, 27 F.3d 783, 799 (2d Cir.1994). But here, the policies issued by Maryland, CNA and Royal contain other insurance clauses that require apportionment of defense costs on a pro rata basis. Hence, analyzing the ratio of indemnity exposure to amount paid in settlement is entirely proper. Here, Royal and General paid more than their pro rata shares.

■ The controlling inquiry under an equitable analysis is whether one party is unjustly enriched at the expense of another—the law abhors unjust enrichment. Here there was no enrichment of the policyholder, nor any collusion between the late settlers and Grace, nor any benefit other than the indemnification and defense of potentially covered claims. The notion of unjust enrichment applies where there is no contract between the parties, as in the case of the parties to this appeal, and where the party sought to be charged for contribution, has money which it should not retain, but should under equitable principles turn over to another.

In the instant case for Maryland and CNA to succeed they must first demonstrate that Royal and General were enriched and, second, that such enrichment was unjust. *See Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982). The core argument Maryland and CNA make in claiming that Royal and General were unjustly enriched is that these later settling insurers simply sat back and waited until the early settling insurers paid amounts that settled Grace's claim for defense costs accruing prior to the Maryland and CNA settlements. Whatever validity this view might have in the context of a single claim, *see Sharon Steel Corp. v. Aetna Casualty & Surety Co.*, 931 P.2d 127 (Utah 1997), it ignores the reality that, in the context of asbestos litigation, new claims are being presented all the time.

Thus, while Royal and General were supposedly benefitting by waiting until Maryland and CNA settled, these later settling insurers were becoming liable for significant and escalating defense costs accruing after the early settlements. The early settlements left Royal and General exposed to these later defense costs and spared Maryland and CNA liability for them. By the same token, if Royal and General had from the outset been contributing pro rata to indemnity and defense payments, the indemnity limits of the Maryland and CNA policies would have been paid out over a longer period before exhaustion, during which extended period Maryland and CNA would have become responsible for shares of the rapidly escalating defense costs. It is therefore possible that Maryland and CNA benefitted because (without contributions by Royal and General) their policy limits were exhausted before the associated defense costs became crushing. On this record, it cannot be determined whether (overall) Maryland and CNA paid more in combined indemnity and defense payments as a result of the non-contribution of Royal and General, or whether (overall) Maryland and General paid less.

In this context, all the insurers faced difficult decisions as to when they should settle. Each gained something and lost something by the timing of their settlements. Even with the benefit of hindsight, it cannot be said that the payments made by all four insurers resulted in any benefit to any of them that should equitably be shared with any other insurer. As a consequence, since neither Royal or General was unjustly enriched, it follows that appellants' contribution claims must fail.

## CONCLUSION

Finally, as counsel for Maryland and CNA concede, there is no way to establish that because of the sequence of insurance payments and settlement, the early settlers paid more than they otherwise would have paid, or that the late settlers paid less. Hence a remand to take proof seems pointless. Moreover, considering the loss from beginning to end, all insurers paid indemnity and defense in amounts satisfactory to a policyholder that faces losses that potentially exceed all its insurance.

Accordingly, the judgment is affirmed without costs to any party.